UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x
JAMES VARGO,

                Petitioner,

          -against-

UNITED STATES OF AMERICA,

                Respondent.
---------------------------------------------------------------------x

**MEMORANDUM & ORDER**
06-CV-4846 (NGG)

NICHOLAS G. GARAUFIS, United States District Judge.

On November 3, 2003, a jury found Petitioner James Vargo ("Vargo") guilty of conspiring to distribute and possess with intent to distribute the controlled substance MDMA ("ecstasy"). (03-CR-601, Docket Entry # 24; see 03-CR-601, Docket Entry # 7 (Indictment).) The evidence at trial established *inter alia* that Vargo was an ecstasy broker who, acting through Edgar Charria, another ecstasy broker, on one occasion provided a buyer, Steve Capuano, with real ecstasy pills and on another occasion provided both Capuano and Diego Holguin, another ecstasy buyer, with fake ecstasy pills. The evidence at trial also established that, after Vargo discovered that his supplier had given him fake pills, Vargo committed an armed robbery of his supplier, binding him, pistol-whipping him, and stealing several hundred thousand dollars and thousands of ecstasy pills.

On January 26, 2005, this court sentenced Vargo to seventy-eight months' imprisonment followed by three years supervised release and a $100 special assessment. (03-CR-601, Docket Entry # 43.) Vargo filed an appeal of his conviction and sentence with the United States Court of Appeals for the Second Circuit, asserting ineffective assistance of trial counsel and various other claims related to evidentiary matters and to the court's instructions to the jury. The court of

appeals stated that there was a "strong argument that the evidence of the robbery was unduly prejudicial and should not have been admitted." United States v. Vargo, 185 Fed. Appx. 111, 113 (2d Cir. 2006) (summary order). However, Vargo had not made the required showing of prejudice under the plain error standard: "In light of the totality of the evidence presented at trial indicating that Vargo conspired to distribute Ecstasy, we cannot say, on this record, that it is more likely than not that the error affected the outcome of the trial." Id.

The court of appeals declined to address Vargo's ineffective assistance claim, on the basis that the district court would be better able to develop the facts necessary to determine the adequacy of Vargo's representation at trial. Id. The court of appeals further stated that although Vargo had failed to show that any of the errors at trial prejudiced him under the plain error standard, it was expressing no view as to whether Vargo could make the lower showing of prejudice required to make out an ineffective assistance claim. Id. After considering and rejecting the rest of Vargo's claims, the court of appeals upheld Vargo's conviction and sentence. Id. at 115.

Vargo now moves to vacate his sentence pursuant to 28 U.S.C. § 2255. Vargo's principal argument is that his trial counsel was ineffective for failing to object to the introduction of the armed robbery evidence. On May 30, 2008, noting that Vargo's petition presented arguments of great substance and that Vargo had already served much of his sentence, the court granted Vargo's application for bond pending decision on his § 2255 motion. (See Order (Docket Entry # 26).) On June 12, 2008, the court stayed its May 30, 2008 Order. (Docket Entry # 29.)

For the reasons stated below, Vargo's Petition is DENIED.

I.   **Vargo's Trial**

The Government's principal witness at trial was Edgar Charria, the broker who paired Vargo with buyers of ecstasy.[1]  After testifying about his prior criminal history and his cooperation agreement with the Government (Transcript ("Tr.") at 76-93), Charria testified at length about two occasions in 1999 when he brokered the purchase of ecstasy by Steve Capuano from an ecstasy supplier named G (id. at 93-124).  Charria testifed that he was friendly with Michael Schneider, a friend of Capuano's, and also with Joey, who knew G.  (Id. at 94-96.)  After Schneider told Charria that he needed an ecstasy supplier and Joey told Charria that he knew an ecstasy source, Charria made the match.  (Id. at 95-98.)  Charria testified that before the first ecstasy transaction, he met Joey, Schneider, and Capuano near the Queensborough Bridge. (Id. at 102.)  Only Joey and Schneider came to carry out the second transaction.  (Id. at 114.) Both times, Charria walked with Schneider and Joey to G's apartment, where they exchanged Capuano's money for G's ecstasy.[2]  (Id. at 103-105, 114-16.)  Each time, Joey gave Charria a fee for arranging the transactions.  (Id. at 106, 117.)  Charria testified that, the second time, the ecstasy Capuano received was "weak and chalky" and that Schneider tried to get Charria to help him either exchange the pills or get a refund.  (Id. at 118, 123.)

Capuano also testified about these transactions.  Although Capuano corroborated the general outlines of Charria's testimony, his testimony contradicted Charria's in several respects.

---

[1] The evidence at trial will be presented principally by describing Charria's testimony. Significant inconsistencies between Charria's testimony and the testimony of the other witnesses at trial will be noted either in the text or in the notes.

[2] Oddly, although Charria testified that the first time, Joey had to talk to the doorman in G's apartment to gain access, he later testified that Joey shared the apartment with G.  (Id. at 103, 114.)

For example, besides testifying that he purchased ecstasy from Charria three, not two, times in 1999 (id. at 407, 412), Capuano also testified that he and Schneider met Charria to do the first drug deal in Bloomfield, New Jersey, not by the Queensborough Bridge, as Charria testified (id. at 399). According to Capuano, the three of them met at a parking lot in Bloomfield and then he and Schneider followed Charria's car into Manhattan to the Queensborough Bridge. (Id.) Additionally, Capuano testified that he was present at the second ecstasy transaction described by Charria and that this transaction was actually carried out in two parts: Charria originally gave Schneider half the ecstasy Capuano had ordered and only gave him the second half — the half which was "placebo like" — days later. (Id. at 413-14.)

After testifying about these transactions with G, Charria testified about three ecstasy transactions in 2000, all of which involved Vargo. Charria testified that in June 2000, he went to Scores, the strip club where Vargo worked, in order to exchange steroids with Vargo. (Id. at 127, 131.) After Charria told Vargo about how Capuano and Schneider had been robbed, Vargo told Charria that he would look around and see whether he could find an ecstasy supplier for them. (Id. at 132.) The next month, Charria ran into Capuano at a bodybuilding show and told him he might have another ecstasy supplier to replace G. (Id. at 132-33.) Charria then called Vargo, who told Charria to bring Capuano to Scores so that they could meet. (Id. at 134.) Charria then brought Capuano and Jimmy Woodring, Capuano's friend, to Scores where they had had some drinks and discussed the quantity and price of the ecstasy that Capuano would buy. (Id. at 135-36.) Later, after Vargo told Charria that he would definitely be able to line up a source for the ecstasy, Charria set up a meeting date to do the drug deal. (Id. at 137.) On that date, Capuano, Woodring, Charria, and Vargo met at a pizzeria near the Queensborough Bridge and walked

together to Vargo's apartment on 61st Street. (Id. at 140-41.) Charria and Vargo then went with Capuano's money-filled backpack to the apartment of Vargo's source. (Id. at 143-44.) While Charria waited outside, Vargo went inside and exchanged the money for ecstasy pills. (Id.) Vargo and Charria then returned to Vargo's apartment where Vargo gave Woodring and Capuano the ecstasy pills. (Id. at 144.) While Woodring and Capuano counted the pills, Charria walked to the kitchen with Vargo, who gave him between $1,200 and $1,300 for brokering the transaction.[3] (Id.) After Woodring and Capuano had finished counting the pills, and had tried them to make sure that they were real, Charria walked Capuano and Woodring to their car and saw them on their way. (Id. at 145.)

When they testified about this first transaction with Vargo, Capuano and Woodring's testimony contradicted Charria's in several respects. For example, although Capuano confirmed Charria's testimony that they met at a bodybuilding show, Capuano testified that he later also met Charria at a diner in New Jersey, where they actually made the deal for the ecstasy. (Id. at 426-27.) Capuano did not testify that he met Vargo at Scores, and implied that he met Vargo for the first time at the Queensborough Bridge, when he and Woodring came to buy the ecstasy. (Id. at 427.) Woodring, however, did testify that he and Capuano met Vargo for the first time at Scores (id. at 555) and that, after that meeting, when he and Capuano were driving back home, Capuano said that Charria told him that Vargo might have a source for ecstasy (id. at 554). Capuano and Woodring also testified, in contrast to Charria that when they met Charria and Vargo to do the ecstasy deal, they picked up Charria and Vargo in their car and then drove around the corner and

---

[3] Woodring testified that at one point he used the bathroom, and, as he was walking out, he saw Vargo and Charria exchanging money. (Id. at 558.)

parked in front of Vargo's apartment. (Id. at 428, 555.) Both Capuano and Woodring also testified that Capuano went with Vargo and Charria to Vargo's source's apartment, whereas Charria testified that only he went with Vargo. (Id. at 433, 556.)

Charria testified that several weeks after this first transaction, he set up another transaction between Capuano and Vargo. (Id. at 146.) In testimony that was largely corroborated by Woodring and Capuano, Charria testifed that he met Capuano and Woodring at the pizzeria near Vargo's house. (Id. at 147, 438, 560.) They then walked to Vargo's apartment. (Id. at 148.) Capuano gave Vargo a backpack full of money and Vargo left, alone, to get the ecstasy. (Id. at 438, 560.) After twenty minutes, according to Charria and Capuano (id. at 151, 438), or a few hours, according to Woodring (id. at 560), Vargo returned with ecstasy pills that were white and shaped like stars (id. at 152, 439, 561). Capuano and Woodring tried the pills and did not feel much but decided to go home anyway. (Id. at 152, 439, 561-62.) Vargo then gave Charria about $1,500 for bringing Capuano and Woodring to him, and Charria walked Capuano and Woodring to their car. (Id. at 152-53.)

Charria also testified that, at the same time of this second transaction involving Vargo, Capuano, and Woodring, he also served as a broker between Vargo and Alex Holguin, from whom Charria had previously purchased steroids. (Id. at 149.) Charria testified that he introduced Holguin to Vargo at Scores, where Holguin agreed to buy between 800 and 1,000 ecstasy pills from Vargo. (Id. at 149-150.) When Charria arrived with Capuano and Woodring at Vargo's apartment for their second transaction with Vargo, Vargo already had the pills for Holguin. (Id. at 151.) Charria went downstairs and gave Holguin, who was waiting inside a car, pills that looked just like the pills Vargo later brought for Capuano and Woodring. (Id. at 151-

52.)

Holguin testified that his meeting with Vargo actually occurred at a pizzeria where he often did deals with Edgar, not at Scores. (Id. at 263.) Holguin described the setting and the conversation in considerable detail (id. at 285-87), and testified that, although his conversation was mostly with Charria, Charria mentioned to him that Vargo was the person who would actually be supplying the pills (id. at 287). However, Holguin also testified that Charria did not tell him where Charria would be getting the pills: "He just tell me that that was his friend and just go get the money and just come by and get the pills." (Id. at 287.) Holguin testified that that same day he went back to get the money and then returned to the pizzeria, where he met Charria and obtained the 800 ecstasy pills. (Id. at 288-89.)

Charria testified that soon after Holguin, Capuano, and Woodring left with the ecstasy pills, Capuano and Holguin called to tell him the pills were defective.[4] (Id. at 154, 156-57.) In fact, Capuano began calling Charria so often about the pills that Charria gave him Vargo's number. (Id. at 155.) Charria testified that he then called Vargo to tell him that Capuano would be calling him; Vargo responded that he would take care of the problem and exchange the bad pills for good ones. (Id.) Charria testified that, some time after this conversation, he was going out to dinner with his girlfriend, Kelly Horling, when Capuano called him to tell him that he and Woodring were going to meet Vargo to exchange the pills.[5] (Id. at 156.) Charria testified that he went over to Vargo's building with Horling and that he ran into Capuano, Woodring, and Vargo

---

[4] At trial, the Government played a non-consensually recorded conversation in which Holguin implicated a "bald guy," whom he later identified as Vargo, as a person who had passed along "f'ing stars" to him. (Id. at 369.)

[5] Capuano testified that it was actually Charria who set up this meeting. (Id. at 443.)

as they were making their way into Vargo's apartment.[6] (Id. at 157-58.) Vargo's girlfriend was in the apartment. (Id. at 158.) Vargo then signaled Charria to take a walk with him. (Id.) Outside, Vargo and Charria met Joey, a friend of theirs. Vargo told Charria that Vargo's supplier, with whom they were going to exchange the pills, always had a guard with a gun, and he tried to give Charria a gun. (Id. at 159-60.) When Charria refused to take the gun, Vargo told him to go back to the apartment. (Id. at 160.) Vargo and Joey then left and Charria went back to the apartment. (Id.) After waiting a while, Vargo called Charria and told him that "things went bad" and asked him to get "the girls out of there." (Id. at 161) After telling Capuano and Woodring to leave, Charria left with his girlfriend and Vargo's girlfriend for New Jersey. (Id. at 162.)

The next day, Vargo came to New Jersey and gave Charria $1,400, saying it was a "gift from Joey." (Id. at 163-64.) Vargo told Charria that the day before, he, Joey, and a guy called "Pistol Pete" went into the supplier's apartment and asked to exchange the pills. The supplier refused, and so they pulled their guns and tied everybody up. (Id.) Vargo eventually found some ecstasy and money in a closet in some boxes. (Id. at 164.)

Charria's account was partially corroborated at trial by Horling, who testified about her and Charria's detour to Vargo's apartment, her subsequent trip to New Jersey with Charria and Vargo's girlfriend, and about how Vargo later joined them in New Jersey. (Id. at 376-79.) Capuano also testified at trial that, as he was waiting outside Vargo's building in his car with Woodring, Charria told him that the supplier got "fresh" with Vargo, that Vargo duct-taped the

---

[6] Capuano testified that he and Woodring actually met only Charria, who was eating a piece of pizza, outside. Capuano testified that they then went up to Vargo's apartment to wait for Vargo, who had already left. (Id. at 443.)

supplier and took "everything he had." (Id. at 444.) Woodring testified at trial that Capuano and he got in their car and followed Charria. They pulled into an alley, Charria came back to their car and told them that Vargo had "pistol whipped" somebody and got pills or money. (Id. at 564.)

Charria's account of what Vargo told him about the armed robbery was corroborated at trial by Alexander Nersesian, who witnessed the robbery. Nersesian testified that he was an ecstasy dealer who, on occasion, purchased ecstasy pills from a man in New York City named Steve Levy, also known as Zvi Hagger ("Hagger"). (Id. at 630.) In August or September of 2000, Nersesian went to Hagger's apartment to purchase ecstasy. (Id. at 637.) On his way into Hagger's apartment, Nersesian saw a man called James leaving the apartment. Nersesian testified that he had previously met James through Hagger and that he had seen James at Hagger's apartment and at Scores, where James worked. (Id. at 638.) Once he was in the apartment, Hagger told him to lock the door and wait several hours. (Id. at 641.) Later, Nersesian heard a knock at the door and saw James through the peephole. (Id. at 642.) Hagger told Nersesian to open the door. (Id.) When Nersesian opened the door, James entered with two other men, who had guns. (Id. at 643.) The men told Nersesian to lie on the floor and that, if he did not move, he would live. (Id.) One of the men searched Nersesian and then put a pillow on Nersesian's head, putting a gun to the pillow. (Id.) Nersesian saw James and the other man go down the hallway to Hagger's bedroom. (Id. at 644.) Nersesian heard slapping, and Hagger crying and saying "Don't kill me. I'm sorry. It was my fault. I make it up to you. We will make money." (Id. at 645.) He heard somebody asking Hagger the combination for a safe and then the sounds of a safe opening. (Id.) He then heard men looking for something and then the sounds of the men leaving. (Id.) After the men left, Hagger, who was tied up with duct tape, came by

Nersesian. (Id.) Hagger told Nersesian that the men had robbed him of $250,000, jewelry and 5,000 ecstasy pills. (Id. at 646) Nersesian then saw that his bag, with $38,000 or $39,000, was also missing. (Id. at 638, 646.) Hagger told Nersesian that he was robbed because he had sold bad ecstasy. (Id. at 647.)

At the trial, Nersesian was unable to identify Vargo as the "James" he had referred to (id. at 641), but he did state that James was a bouncer at Scores (id. at 638) and described James's physical appearance (id. at 642).

The testimony at trial further established that Vargo never shared the proceeds of his robbery of Hagger with Capuano or Holguin, who had purchased the bad ecstasy pills. In fact, Capuano, Woodring, and Charria testified that Vargo later stole from Capuano the bad ecstasy pills he had sold him. (Id. at 171-72, 469, 565.)

The Government's last witness at trial was Joseph Vecchione, a special agent with the FBI. (Id. at 693.) Vecchione testified about the valuable cooperation that Holguin, Capuano and Woodring had provided the Government. (Id. at 704, 706, 708.) The Government also used Vecchione to introduce into evidence laboratory records showing that a white star-shaped tablet given to him by Holguin contained no ecstasy (id. at 708-710), to authenticate the telephone records of Capuano, Charria, Vargo, Woodring, Holguin, and Scores (id. at 712-15), and to authenticate a nonconsensually recorded telephone conversation between Capuano and Holguin referring to Vargo and to the robbery, (id. at 703).

## II.     Ineffective Assistance of Counsel

### A.     Trial Counsel's Performance

To demonstrate that counsel was constitutionally ineffective, first, a petitioner "must

show that counsel's performance was deficient." Strickland v. Washington, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. at 690. Courts must be highly deferential in pursuing this inquiry, making every effort "to eliminate the distorting effects of hindsight" and operating with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. More specifically,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

Id. at 690-91.

The Government has submitted to the court an affidavit of trial counsel that proffers several purported strategic rationales for his conduct at trial. (Affidavit ("Aff.") (Docket Entry # 17) ¶ 4.) In addition, trial counsel has submitted to the court an additional declaration that provides additional details regarding his representation of Vargo. (Declaration ("Decl.") (Docket Entry # 27) ¶ 2-5.)

### 1. The Armed Robbery Evidence

On its face, Vargo's trial attorney's failure to object to the introduction of evidence of the armed robbery appears to be unreasonable, for this evidence likely inflamed the jury against Vargo, involving as it did conduct that painted Vargo in an unflattering light as a double-crossing, violent, and selfish criminal and that also served the purpose of further lending corroboration to a case that otherwise rested heavily on the testimony of cooperating witnesses.

If objecting to the introduction of the evidence were a futile endeavor, trial counsel's failure to object would not have been unreasonable. See United States v. Abad, 514 F.3d 271, 276 (2d Cir. 2008) ("counsel could not therefore have been ineffective for failing to make a motion that would have been futile.") However, as the court of appeals has stated, there was a "strong argument" that the evidence of the armed robbery should have been excluded as unduly prejudicial under Fed. R. Evid. 403's balancing test. Vargo, 185 Fed. Appx. at 113-14. As described above, this evidence was highly prejudicial to Vargo. Moreover, although it was probative of the existence of the conspiracy, in light of the other proof available at trial, the danger of unfair prejudice resulting from the introduction of the armed robbery evidence was significant in relation to its probative value. Furthermore, the evidence relating to the armed robbery could easily be separated from the other evidence of the conspiracy's activities and therefore was not necessary for the Government to present a "colorful story with descriptive richness." Old Chief v. United States, 519 U.S. 172, 187 (1997); cf. United States v. Persico, 425 F.2d 1375, 1384 (2d Cir. 1970) (objected-to testimony was "so closely bound up" with the directly relevant testimony that it would not have influenced the jury unless the jury also believed the relevant testimony). In light of these strong arguments that evidence of the armed robbery should have been excluded, trial counsel's belief that an objection was "highly unlikely to succeed given the other evidence in the case and the Second Circuit cases which address the admissibility of evidence of conspiracies," (see Aff. ¶ 4), is not sufficient to justify his failure to object to the evidence.[7]

---

[7] Trial counsel could also have argued that evidence of the armed robbery should have been excluded under Rule 404(b) as evidence of other bad acts probative only of Vargo's bad character. Trial counsel would have had a strong argument that evidence of the armed robbery was not so inextricably linked with evidence of the charged conduct for it to be exempt from the

Trial counsel has also proffered two purported strategic rationales for not objecting to the evidence of the armed robbery. First, he states that in order to prevent members of the jury from viewing him as "obstructionist," he refrained from objecting to the prosecutor's first sentence in his opening, which mentioned the robbery, especially as he thought an objection would likely be overruled. (Aff. ¶ 5.)

Whether a decision was taken for a tactical reason is a question of fact. Porter v. Singletary, 14 F.3d 554, 558 (11th Cir. 1994). Given trial counsel's statement that he knew of the armed robbery evidence before the start of trial and had in fact discussed it with a potential witness (Decl. ¶ 2-5), trial counsel need not have waited until the prosecutor mentioned the armed robbery in order to move for it to be excluded *in limine*. The court therefore concludes that trial counsel's failure to object to the armed robbery evidence was not the fruit of a strategic decision to preserve the possibility of developing a positive rapport with the members of the jury. Moreover, if trial counsel did not think of filing a motion *in limine* to exclude the evidence and then actually decided not to object in order to preserve his rapport with the jury, this would evidence an "abdication—not an exercise—of professional judgment," McQueen v. Swenson, 498 F.2d 207, 216 (8th Cir. 1974), that would certainly be outside the "wide range of professionally competent assistance."

Trial counsel's second purported rationale for not objecting to the armed robbery

---

reach of Rule 404(b), see United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000), and also that, since the Government's evidence demonstrated that Vargo committed the robbery for personal gain and not in furtherance of the ends of the conspiracy, the challenged evidence should not have been admissible to show the existence of the conspiracy, see United States v. Tramunti, 513 F.2d 1087, 1118 (2d Cir. 1975).

evidence is that the armed robbery helped his theory of the case, which was that the Government's cooperating witnesses were lying about Vargo in order to curry favor with the Government. Several of the agent reports of witness debriefings made no mention of the armed robbery, and trial counsel states that "[b]ased on these inconsistent statements, I believed there was a chance that the jury would discount all of the cooperating witnesses' testimony and thereby win an acquittal for Mr. Vargo." (Aff. ¶ 6.)

This rationale is inconsistent with the other rationales put forth by counsel. If trial counsel did not think an objection would have been successful and decided not to object in the seconds following the first sentence of the Government's summation, it is unlikely that his decision not to object was also informed by his analysis of the agent reports of the witness debriefings. Even if it was, however, trial counsel's strategic decision to allow the introduction of evidence of a highly prejudicial armed robbery on the speculation that it would provide "excellent fodder for cross-examination" would fall outside the "wide range of professionally competent assistance." Trial counsel must know that the Government is not required to disclose all of its evidence to the defense before trial, see Mehler et al., Federal Criminal Practice: A Second Circuit Handbook §§ 14-2, 14-3, 14-4 (2006 ed.), and that the Government might have introduced other evidence — including, in this case, an eyewitness account (Tr. at 608-49) and wiretap recordings (see id. at 847) — which would corroborate the cooperators' testimony of the armed robbery. Trial counsel should also have realized that the failure of cooperating witnesses who had not even witnessed an armed robbery to mention it during interviews with FBI case agents was not the kind of "smoking gun" whose evidentiary significance might have outweighed the very substantial prejudice arising from Vargo's implication in a violent armed robbery. Even

if it were motivated by strategic considerations, trial counsel's failure to object to the armed robbery evidence therefore qualifies as "deficient" performance under Strickland. See, e.g., Henry v. Poole, 409 F.3d 48, 71 (2d Cir. 2005) (strategic decision to introduce false alibi is so harmful to petitioner that it cannot be the fruit of sound professional judgment).

### 2. Vargo's Other Arguments Regarding Trial Counsel's Performance

Vargo also argues that his counsel was ineffective for failing to request a no-adverse inference charge and for failing to object to statements by the Government in which it allegedly vouched for the credibility of its witnesses. The court finds that any objection to the Government's statements regarding the credibility of its witnesses would have been of little merit. The Government is "allowed to respond to an argument that impugns its integrity or the integrity of its case, and when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion." United States v. Carr, 424 F.3d 213, 227 (2d Cir. 2005). Where petitioner's trial counsel has vigorously attempted to undermine the integrity of the Government's witnesses and has accused them of fabrication, the Government may introduce evidence of testimony cooperating witnesses have given in other cases and may stress that cooperators had no reason to lie and in fact have an incentive to tell the truth. Id. at 227-30. Because Vargo's entire theory of the case rested on an alleged fabrication of testimony by the Government's cooperating witnesses, see infra at 19, the Government's references to its witnesses' 5K letters and to the helpful cooperation they had provided to the Government was not improper. Trial counsel cannot be faulted for failing to make an objection that would be unlikely to succeed, see Abad, 514 F.3d at 276, and this failure to object to the Government's

alleged vouching did not constitute deficient performance.

As for trial counsel's failure to request a no-adverse-inference charge, trial counsel has stated in an affidavit that he purposefully did not request such a charge in order not to draw attention to Vargo's failure to testify. Vargo now asks the court for limited discovery into trial counsel's trial experience in the last ten years to see whether trial counsel has operated under a similar theory in the past or whether this rationale is spurious. As the court has already found trial counsel's performance to be deficient with respect to the armed robbery evidence, it believes there is no need for such discovery. In any case, in its examination of the second prong of Strickland, to determine whether Vargo has shown that he was prejudiced by trial counsel's deficient performance, the court will assume *arguendo* that trial counsel was deficient for failing to request a no-adverse inference charge.

### B. Has Vargo Demonstrated Prejudice Under Strickland?

Although he has succeeded in demonstrating that his trial counsel's performance was deficient, Vargo can succeed on his ineffective assistance of counsel claim only if he can also show that he thereby suffered prejudice. Strickland, 466 U.S. at 687. A petitioner suffers prejudice where there exists a reasonable probability that, but for counsel's errors, the result would have been different. Id. at 694. A reasonable probability is a probability sufficient to "undermine confidence in the outcome." Flores v. Demskie, 215 F.3d 293, 304 (2d Cir. 2000). In determining whether this reasonable probability has been shown, the court

> must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.

> Moreover, a verdict or conclusion only weakly supported by the record is more
> likely to have been affected by errors than one with overwhelming record support.

Strickland, 466 U.S. at 695-96.

Therefore, the weight of the evidence that would have been presented to the jury absent counsel's error is a highly relevant factor in determining whether an error prejudiced the petitioner. If the Government's case against the petitioner was strong, see Abad, 514 F.3d at 276, or if the Government's evidence against the petitioner was overwhelming, see United States v. Guang, 511 F.3d 110, 120 (2d Cir. 2007), it is less likely the petitioner will be able to make the required showing of prejudice. Petitioner will be much more likely to be able to establish prejudice if the Government's case is weak — for example, if only the testimony of one, unreliable witness tied petitioner to the crime. See Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007); Gersten v. Senkowski, 426 F.3d 588, 607 (2d Cir. 2005).

A petitioner's showing of prejudice will also be aided if he can show that the error of trial counsel foreclosed or made more difficult the presentation to the jury of a viable theory that would have undermined the Government's case against the petitioner. For example, in Cox v. Donnelly, 387 F.3d 193, 200 (2d Cir. 2004), trial counsel's failure to object to an erroneous instruction on intent was held prejudicial where the evidence of intent was not overwhelming and where the evidence showed that the jury was headed for a deadlock until it heard the erroneous instruction for the third time. On the other hand, in United States v. Kaid, 502 F.3d 43, 47 (2d Cir. 2007), counsel's absence during the direct examination of a critical witness was held not to be prejudicial where counsel was still able to, and did, test the witness's credibility through cross-examination. In Murden v. Artuz, 497 F.3d 178, 199 (2d Cir. 2007), defense counsel's

failure to pursue an emotional disturbance defense also was held not prejudicial where the defense would likely not have been very persuasive. See also Hemstreet v. Greiner, 491 F.3d 84, 91-92 (2d Cir. 2007).

Here, the Government's case against Vargo was strong. Four cooperating witnesses — Charria, Holguin, Capuano, and Woodring — attested to facts showing that Vargo committed the acts charged in the Indictment. Telephone records introduced at trial corroborated their testimony by confirming that telephone calls they had testified about actually occurred. A laboratory report confirmed that a bad ecstasy pill that Holguin testified Vargo sold him indeed contained no ecstasy. In addition, the fact of the meeting that occurred in Vargo's apartment before he left to exchange the bad ecstasy pills was corroborated by Kelly Horling, a non-cooperating witness.

Multiple cooperating witnesses at trial implicated Vargo in activity that was unequivocally illegal and that, if believed, would clearly demonstrate guilt of the crime charged. As a result, Vargo can succeed in showing that trial counsel's deficient performance prejudiced him only if can demonstrate that, absent this deficient performance, there is a reasonable possibility that trial counsel could have succeeded in convincing the jury that the cooperating witnesses' testimony was fabricated. Although this theory of fabrication was further undermined by evidence of the robbery — which included the testimony of a fifth cooperating witness, Nersesian, and a wiretap recording of a conversation implicating Vargo in the robbery that occurred before any motivation to fabricate would reasonably have arisen — it was not a strong theory even without this additional evidence. As described above, the evidence of the cooperating witnesses was corroborated both by physical evidence — the telephone records, a

-18-

wiretap recording of a conversation implicating Vargo in the sale of the bad ecstasy pills, and the laboratory test of the bad ecstasy pill — and by the testimony of Horling. Moreover, it is unlikely that Capuano, Woodring, Charria and Holguin collaborated in fabricating a case against Vargo. As illustrated by the description of the evidence presented at trial, although there were contradictions in the testimony of the cooperating witnesses, they were by no means so pervasive as to render such a theory plausible, relating as they did to tangential details of where meetings happened and who was present where. Such contradictions would be the ordinary result of the substantial lapse of time between the events the witnesses were testifying about and the trial. Moreover, the testimony of the various witnesses at trial about transactions that did not involve Vargo, such as Capuano's purchases of ecstasy from G, was no more consistent than the testimony that did concern Vargo. In sum, although the reliability of cooperating witnesses needed to be carefully evaluated by the jury, their testimony still had probative value, and it was certainly strong evidence of guilt that four separate cooperating witnesses told a largely consistent story of Vargo's guilt.

In any case, Vargo's trial counsel vigorously questioned the veracity of the cooperating witnesses. (See Tr. at 196-97 (eliciting fact that Charria failed to mention certain illegal activity to the Government in his proffer sessions), id. at 204 (demonstrating variance between Charria's trial testimony and his statements at his proffer session), id. at 308 (characterizing Holguin as a "professional cooperating witness"), id. at 322 (trying to establish that Holguin sold drugs during the pendency of a previous cooperation agreement), id. at 370 (accusing Holguin of fabricating testimony against Vargo).) Vargo's theory that the cooperating witnesses had fabricated a case against him was therefore effectively put before the jury. The court does not believe, given the

strong evidence presented against Vargo, that there is a reasonable probability that the very speculative theory that he was framed by the cooperating witnesses would have had success with the jury even if the highly prejudicial evidence of the robbery had been properly excluded and even if a no-adverse-inference charge had been given. Under these circumstances, Vargo would still have had no plausible theory of innocence, and the jury would almost certainly still have returned a verdict of guilty.

## V. CONCLUSION

For the reasons stated above, Vargo's petition is DENIED. The court vacates its Order of May 30, 2008, which was stayed by its Order of June 12, 2008. The Clerk of Court is directed to close the case. Any application for a certificate of appealability shall be granted upon request.

SO ORDERED.

Dated: June 13, 2008  /s Nicholas G. Garaufis
 Brooklyn, N.Y. NICHOLAS G. GARAUFIS
 United States District Judge